Sean **PENDLEBURY** and Laurel Overton, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**STARBUCKS COFFEE COMPANY, a foreign corporation, qualified to do business in Florida as Starbucks Corporation, Defendant.**

No. 04–80521–CIV.

United States District Court, S.D. Florida.

Sept. 21, 2007.

Daniel R. Levine, Adam S. Chotiner, Shapiro Blasi Wasserman & Gora PA, Boca Raton, FL, for Plaintiffs.

Catherine A. Conway, Joel M. Cohn, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, Daniel L. Nash, Nathan J. Oleson, Jessica W. Paniccia, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Fraser A. McAlpine, Akin Gump Strauss Hauer & Feld LLP, Houston, TX, Susan Nadler Eisenberg, Akerman Senterfitt, Miami, FL, for Defendant.

## ORDER AND OPINION

KENNETH A. MARRA, District Judge.

This Cause came before the Court upon Defendant's Motion for Decertification, filed on April 9, 2007. (DE 291.) On May 4, 2007, Plaintiffs filed their response. (DE 313.) Defendant filed its reply on May 25, 2007 (DE 347) and Plaintiffs filed their sur-reply on May 31, 2007 (DE 352). The Court has considered the motion, the record, and is otherwise fully advised in the premises. The matter is now ripe for review.

## I. Background

Plaintiffs are two former Starbucks managers who claim they were improperly classified as exempt from the overtime requirements of the Fair Labor Standards Act. ("FLSA"), 29 U.S.C. § 216(b). At the heart of their claim, Plaintiffs allege they did not have management as their primary duty; rather, Plaintiffs were allegedly glorified baristas,[1] serving coffee and performing the same tasks as the other employees/partners.[2] As exempt employees, Plaintiffs were paid a salary and were not entitled to overtime compensation. Plaintiffs seek to recover payment of unpaid overtime wages, liquidated damages and reasonable attorney's fees and costs for Starbucks' alleged violation of the FLSA.

On January 3, 2005, following the two stage approach articulated in *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir.2001), the Court granted Plaintiffs' request for conditional certification of this case as a collective action and for permission to notify all "similarly situated" Starbucks managers of their opportunity to join the litigation. (DE 56.) After conditionally certifying the class, the Court reserved judgment on the ultimate question of whether the class members are truly "similarly situated" pending discovery. In the more than two years since the Court issued its Order, nearly 900 Plaintiffs have joined the action, the parties have engaged in extensive discovery and Defendant has filed the instant Motion for Decertification.

## II. Standard

### Similarly Situated

The FLSA provides that an action for overtime compensation "may be maintained ... by any one or more employees for and in behalf of himself or themselves *and other employees similarly situated.*"

---

1. Webster's New Millennium Dictionary of English defines "barista" as "a person who works at the counter of a coffee shop; a coffee bar server."

2. Although not directly addressed by either party, it appears from the evidence that employees are also referred to as "partners."

29 U.S.C. § 216(b) (emphasis added). The Eleventh Circuit Court of Appeals has outlined a two-tiered procedure to guide district courts in deciding whether plaintiffs are "similarly situated" for purposes of class certification under § 216(b). *Hipp*, 252 F.3d at 1217; *Cameron–Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 (11th Cir.2003) ("*Hipp* outlined a two-tiered procedure that district courts should use in certifying collective actions under § 216(b) ..."). At the "notice stage" of the two-tiered procedure, a court's determination is "usually based only on the pleadings and any affidavits which have been submitted." *Hipp*, 252 F.3d at 1218 (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir.1995)). "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id.* The second stage of the two-tiered procedure usually occurs at the end of discovery upon the defendant's motion for decertification of the class. *Id,* At the second stage, the court has much more information on which to base its decision and makes a factual determination on the similarly situated question. *Id.*

▮ The Eleventh Circuit has recently provided some clarity to the analysis conducted at the decertification stage. *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir.2007). At this stage, the "similarly situated" standard is "less 'lenient' than at the first, as is the plaintiffs burden

in meeting the standard." *Id.* at 953 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001)). The Court in *Anderson* declined to specify how less lenient the standard is, noting "logically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson,* 488 F.3d at 953. Most telling, the court in *Anderson* approved a district court's observation that "although the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Id.* (quoting *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1314 (M.D.Ala.2002)) (internal citations omitted.) With respect to the burden borne by the plaintiff at the decertification stage, the *Anderson* court similarly declined to provide an exact barometer, noting that the district court *may* deny class certification "based solely on allegations and affidavits, depending upon the evidence presented by the party seeking decertification." *Anderson,* 488 F.3d at 953.[3] This suggests plaintiffs need not present deposition testimony demonstrating similarity—affidavits and allegations may be sufficient—depending on whether the defendant can present evidence to demonstrate material distinctions among the class members.

▮ The decision to certify or decertify a collective action under section 216(b)

---

3. Plaintiffs suggest they can satisfy the similarly situated standard by presenting evidence and allegations to show that a defendant engaged in a "unified policy, plan, or scheme of the FLSA violations". *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996). This standard, however, is more appropriately applied at the first stage of the analysis as implicitly recognized in *Hipp* and later confirmed in *Anderson. Anderson,* 488 F.3d at 953 ("In *Hipp*, we followed *Grayson*, but we

also acknowledged, albeit somewhat implicitly, that the lenient standard we adopted in the *Grayson* opinion may be most useful when making a certification decision early in the litigation before discovery has been completed.") As *Anderson* is the most recent and comprehensive proclamation of the Eleventh Circuit's interpretation of the second stage analysis, this Court will closely follow the guidelines it set forth.

is soundly within the district court's discretion. The district court is held to an abuse of discretion standard on legal or procedural questions and a clearly erroneous standard on factual questions; "[a] district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Anderson*, 488 F.3d at 953. Unless the district court's decision amounts to a clear error of judgment, the decision will stand even if the appellate court "would have gone the other way." *Id.* at 954.

■ In performing the similarly situated analysis, the Court will consider the following factors: 1) the disparate factual and employment settings of the individual plaintiffs; 2) the various defenses available to defendants that appear to be individual to each plaintiff and 3) fairness and procedural considerations. *Anderson*, 488 F.3d at 953 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). In conducting this analysis, the Court keeps at the forefront the Eleventh Circuit's repeated assertions that class members need only be similar, not identical. *Anderson*, 488 F.3d at 953; *Grayson* 79 F.3d at 1096.

## Executive Exemption

In order to determine whether members of the class are similarly situated, the Court must consider the salient factors in an exemption analysis. The FLSA provides that employees "engaged in commerce or in the production of goods for commerce" must receive one and one half times their regular rate of pay for hours worked in excess of forty hours each week.

29 U.S.C. § 207(a)(1). If an employer violates this provision, the employer can be liable for the unpaid overtime compensation plus an additional equal amount as liquidated damages. *Id.* § 206(b). However, not all employees are entitled to overtime compensation. Under section 213(a)(1), employers are not required to provide overtime benefits to any employee in a bona fide executive capacity ("exempt employee"). 29 U.S.C. § 213(a)(1). Defendant has classified its store managers as exempt which, if valid, would relieve it of the statutory obligation to compensate the managers for overtime pay.

The administrative regulations provide a "short test" to determine whether an employee is employed in a bona fide executive capacity for purposes of the FLSA executive exemption and therefore not entitled to overtime. 29 C.F.R. § 541.100. Prior to August 23, 2004, the short test included the following criteria; 1) the employee is paid a salary of more than $250 per week; 2) the employee's primary duty is the management of the enterprise or a subdivision and 3) the employee regularly directs the work of two or more employees. 29 C.F.R. § 541.1(f) (1973). The only criteria in dispute is whether the employee's primary duty was management.

To determine whether an employee's primary duty is management, the Court will look at the following factors: (i) the amount of time spent performing non-managerial tasks,[4] (ii) the relative importance of non-managerial duties as compared to other duties, (iii) the employee's relative freedom from direct supervision, (iv) the relationship between the employee's salary and the wages paid to other employees performing nonexempt work and (v) the

---

4. Employees that spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement However, time alone is not the only test and employees who spend less than 50 per-

cent of their time performing exempt work may still be found to be exempt if the other factors warrant such a conclusion. 29 C.F.R. § 541.700 (2005)

frequency with which the employee exercises discretionary powers.[5] 29 C.F.R. § 541.700(a)-(b) (2005); 29 C.F.R. § 541.103 (2004). In August of 2004, the administrative regulation was modified when a fourth criterion was added to the "short test": an exempt executive must be an employee who has "the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, [or] promotion ... are given particular weight."[6] 29 C.F.R. § 541.100(a) (2005) (revised regulations).

The Court will take into consideration all of the factors in determining whether the class is similarly situated for purposes of the executive exemption. Plaintiffs suggest that the modification of the regulation in August of 2004 may require the creation of a sub-class comprised of the 300 Plaintiffs employed after the modification and apply the slightly modified criteria to that sub-class. Because the regulations are non-binding and the suggested criteria listed in the regulations are best characterized as suggestions and by no means exhaustive ("*Some* of these pertinent factors are ..." 29 C.F.R. § 541.103 (2004)(emphasis added)); ("include, but are not limited to ..." 29 C.F.R. § 541.700 (2005)), the Court finds it appropriate to apply the same criteria to the entire class in determining whether the Plaintiffs are similarly situated.

Clearly, when deciding whether an employee's primary duty is management, it is useful to consider the employee's authority to make personnel decisions. Although it was not explicitly included in the factors suggested for determining the employee's "primary duty" under the earlier regula-

tions, it can be argued, as Defendant has, that the managers discretionary authority relative to personnel is and has been a relevant factor. Thus, the elimination of one suggested criterion ("the frequency with which employees exercise discretion") and the addition of another ("authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, [or] promotion ... are given particular weight") does not substantively change the analysis of whether the employee's primary duty was management. The job responsibilities covered by the former and current regulations are overlapping and therefore the Court finds it prudent to consider both in its analysis.

## III. Analysis

### A. Employment Setting and Factual Situation

*Testimony of Starbucks' corporate representatives suggests class treatment is appropriate.*

■ Before wading through the fact-specific analysis of whether the members of the purported store managers class are similarly situated, the Court first turns to evidence obtained from Starbucks' corporate representatives. Defendant designated Sheri Southern, its Vice President of Parmer Resources for International, and Connie Lange, its "compensation manager," under Rule 30(b)(6) to testify to the exemptions asserted by Defendant. Both Ms. Southern and Ms. Lange provide critical insight into Starbucks' operations, including the position of store manager.

Ms. Southern acknowledges that she has been designated by Starbucks to testify as

---

5. The "frequency with which employees exercise discretion" factor was eliminated in the new regulations adopted in August 2004. 29 C.F.R. § 541.700 (2005). However, it was a factor under the regulations before August 2004. 29 C.F.R. § 541.103 (2004).

6. The amount the employee must be paid also changed, increasing the amount to $455 per week. 29 C.F.R. § 541.100(a)(1), (4) (2004). This criteria is not at issue here.

to "the actual job duties and responsibilities of Starbucks store managers." (Pl. Ex. A.1,[7] Southern Dep. at 27.) Ms. Southern has visited hundreds of stores across the United States, supporting the stores and their personnel and is "very aware of what's happening in [Starbucks] stores on a regular basis, not only what we've set up to happen, right, our policies, our procedures our guidelines, but then what's truly happening." (*Id.* at 27, 31.)

At the time of Ms. Southern's deposition, Starbucks had over 10,000 stores worldwide, more than seventy percent located in the United States. (*Id.* at 28.) All of the stores are "generally set up similar." (*Id.* at 64.) This similarity is by design—Starbucks sets up all of it stores in a similar fashion in order to provide customers with a consistent "Starbucks experience." (*Id.* at 59.) This similarity transcends appearance to include functionality, to the extent that when a Starbucks employee, including a store manager, transfers to a different store, the employee generally does not require any new training—aside from educational community training that may be required due to the new geographic area—and can step in and perform his or her duties immediately. (*Id.* at 59–60.) For example, a store manager can transfer from a store in one state to a store in another state and generally be able to run the new store the very next day. (*Id.* at 61.)

In general, all of the stores have the same employee positions (with the exception of an assistant manager.) (*Id.* at 61.) At each Starbucks, there are baristas, shift supervisors, assistant store managers (usually, but not always), and store managers. (*Id.*) Generally, all of the employees—baristas, shift supervisors, assistant managers, and store managers—share similar skills, functions and working conditions. (*Id.* at 62–63.)

Ms. Southern reveals that the job description for the store manager position is created at Defendant's central headquarters in Seattle and is consistent throughout the company—the job description is the same for all store managers. (*Id.* 57–59, 157–58.) The store managers all undertake the same training process which is uniform throughout the United States. (*Id.* at 64, 83.) All store managers are automatically scheduled to work forty hours a week and all report to a district manager. (*Id.* at 95, 161–62.) Perhaps most salient, Ms. Southern acknowledges that the store manager's "duties and responsibilities are consistent throughout the organization" and that the duties and functions of store managers are "generally the same." (*Id.* at 148, 173.) Ms. Southern's testimony is echoed by Connie Lange. When asked if there were any regional differences among the store managers in terms of the exemption, Ms. Lange testified that "there are not any regional differences that I know of that would cause me concern around the store manager exemption." (A.58 Lange Dep. at 174.)

The job description for store manager, which applies to every manager at a Starbucks store, encompasses a number of key responsibilities under the sub-headings Leadership, Planning and Execution, Business Requirements, and Parmer Development/Team Building. (Def. Ex. 38.) The introductory paragraph of the description, labeled "Job Summary and Mission," explains that the "job contributes to Starbucks success by leading a team of store partners to create and maintain the Starbucks Experience for our customers and partners." (*Id.*) The description emphasizes that a majority of the time is spent "supervising and directing the workplace, making staffing decisions, ... ensuring customer satisfaction and product quality,

7. All exhibits preceded by an "A" are Plaintiffs' exhibits.

managing the store's financial performance, and managing safety and security within the store." (*Id.*) Plaintiffs emphasize, and the Court agrees, that this job description cannot be read in a vacuum; rather, it must be read in conjunction with Starbucks' retail management training documents which state that the expectations of a store manager are in addition to the duties, roles, and responsibilities of baristas, shift supervisors, and assistant store managers. (A.66 Retail Management Training Docs—Commination and Building Relationships.) In other words, store managers must perform the duties of these non-exempt employees as well as the duties of a store manager. Thomas Sandberg, a store manager, admits that over seventy percent of his time is spent on barista duties. (A.60 Sandberg Dep. at 103.) Additionally, nearly half, if not more than half, of the store manager training plan, which all store managers complete, focuses on learning and practicing barista and shift supervisor responsibilities. (A.69 Training Plan.) There is little dispute that much of the store managers' time is spent performing non-managerial tasks.[8]

Plaintiffs' similarly situated status is further underscored by Defendant's own policy and practice of classifying all store managers, with the exception of those in California,[9] as exempt. The decision to classify all store managers as exempt comes directly from Starbucks headquarters in Seattle. (A.1 Southern Dep. at 57–58.) Ms. Lange admits that Defendant makes this decision based on the "job itself, not the incumbent performing the job." (A.58 Lange Dep. at 176.) Clarifying that this exemption status is determined on a collective basis, and not after an individualized inquiry of the various store managers, Ms Lange emphasizes that "the job duties captured in the description have been evaluated and determined that this is an exempt position," and "its up to each incumbent to be following the job description and performing the job as prescribed in the job description." (A.58 Lange Dep. at 176–77.) Thus, Defendant employs this blanket classification approach based on the identical job duties and responsibilities its store managers collectively share. As one court has stated: "The Court finds it disingenuous for [Defendant], on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that plaintiffs cannot proceed collectively to challenge the exemption." *Nerland et al. v. Caribou Coffee Company, Inc.*, No. 0:05–cv–1847–PJS, 2007 WL 1170770 (slip op at pp.17–18, D.Minn. April 19, 2007).[10]

---

**8.** In Defendant's brief, it singles out only one opt-in plaintiff who testified that he spends more than fifty percent of his time performing managerial tasks. (Huff Dep. at 149–155, 223–225.)

**9.** On May 12, 2003, Defendant reclassified all of its store managers in California as non-exempt in order to comply with the wage and hour rules in California whereby all exempt employees have to spend more than fifty percent of their work time performing exclusively management tasks. (A.58 Lange Dep. at 70.) Lange testified that only five percent of Starbucks' 500 store managers were in danger of not meeting this stringent requirement.

However, Defendant decided to make a "conservative business decision" and reclassify all of its managers as non-exempt in order to avoid "potential future questions about the job in those instances." (*Id.* at 70–72.)

**10.** Plaintiffs rely heavily on *Caribou* where the district court approved a Magistrate's Judge's report and recommendation to deny the defendant's motion for decertification. *Nerland et. al v. Caribou Coffee Company, Inc.*, No. 0:05–cv–1847–PJS (slip op. at p. 1, D. Minn May 17, 2007)("At bottom, the Court agrees with Judge Graham that, just as defendant was able to determine on a collective basis that all of its store managers were employed

In sum, Starbucks' own admissions demonstrate that store managers are similar in numerous ways. The store managers all follow the same training protocols and all share the same duties and responsibilities. In fact, the store managers' collective duties and responsibilities have been used by Starbucks as justification to classify them *all* as exempt, belying Starbucks' contention that the store managers are not similarly situated for FLSA purposes. However, as Defendant correctly points out, merely classifying a group of employees as exempt does not automatically qualify them as similarly situated. Nonetheless, Defendant's practice of blanket classification does carry *some* weight in this analysis.

### Primary Duty Test

Having found that Starbucks store managers all share similar job duties and are classified the same throughout the United States, the Court next turns its analysis towards a more fact intensive, individualized inquiry to determine if the similarities

of the store managers "extend beyond the mere facts of job duties and pay provisions." *Anderson*, 488 F.3d at 953. Defendant asserts that there are substantial differences among the store managers rendering collective treatment unmanageable and inappropriate. Specifically, Defendant argues that the store managers differ in the essential elements (primary duty test) needed to prove that the exemption classification is proper. The Court notes that an evaluation on the merits of the exemption is not appropriate at this juncture; rather, the relevant question is whether the members of the class are sufficiently similar in the essential criteria needed to uphold or reject the exemption, thereby warranting collective treatment. In making this determination, the Court re-emphasizes that the "FLSA does not require potential class members to hold identical positions." *Id.*

██ In an effort to prove the class is not similarly situated, Defendant relies on deposition testimony from 36 of the 39 Plaintiffs it deposed in this case.[11] Defen-

'in a bona fide executive ... capacity,' so, too, this Court can determine on a collective basis whether defendant's decision was correct.") *Caribou* is factually similar to the present case in that the store managers of a national coffee chain asserted FLSA violations for allegedly being misclassified as exempt employees. The Magistrate Judge concluded the plaintiffs were similarly situated based on three factors: the job description of the store manager includes all roles and duties of team members, all managers worked over forty hours a week, and defendant internally used a generalized approach to determine the appropriateness of its exemption classification for all of its store managers. *Nerland et al. v. Caribou Coffee Company, Inc.*, No. 0:05-cv-1847-PJS, 2007 WL 1170770 (slip op at pp. 17–18, D. Minn. April 19, 2007). The court in *Caribou* did not conduct its analysis under the guidance provided by the Eleventh Circuit in *Anderson* and therefore its analysis falls short of what is required in this circuit. Nonetheless, although its rationale in denying decertification is not controlling, the Court finds its reasoning persuasive as all of the factors are parallel and present in the instant case. *Id.*

11. On January 13, 2006, the Court limited the number of depositions Defendant was permitted to take—36 opt-in Plaintiffs, 24 of whom could be selected by Defendant and 12 of whom would be randomly selected. The parties were required to disclose their trial witnesses prior to the close of discovery. At the close of discovery, Defendant had deposed the two named Plaintiffs, 21 opt-in Plaintiffs that were included on Plaintiffs' trial witness list, and 16 opt-in Plaintiffs that Defendant selected. Defendant did not depose any of the 12 randomly selected opt-in Plaintiffs. Plaintiffs take issue with Defendant's failure to depose the 12 randomly selected opt-ins, arguing this strategy allowed Defendant to "cherry pick" the opt-in Plaintiffs it would depose, in contravention of the Court's discovery order.

Defendant was not required to conduct all of the depositions the Court authorized. If it chose to do so, the Court required that it be done as outlined in the Court's order. Since all of the opt-in Plaintiffs were represented by Plaintiffs' counsel, Plaintiffs had within their control the ability to present any relevant evidence from any opt-in Plaintiff to counter

dant has separated the testimony into the categories relating to the primary duty test and has highlighted what it believes to be material differences among the Plaintiffs, rendering the class dissimilar. As previously discussed, the Court agrees with Defendant's application of the various elements of the primary duty test, both in their current and former form, including the most recently added criterion to the exemption—the authority to make personnel decisions. The criteria are: (i) the amount of time spent performing non-managerial tasks, (ii) the relative importance of non-managerial duties as compared to other duties, (iii) the employee's relative freedom from direct supervision, (iv) the relationship between the employee's salary and the wages paid to other employees performing nonexempt work, (v) the frequency with which the employee exercises discretionary powers, and (vi) the authority to make personnel decisions.

### i. The amount of time spent performing non-managerial tasks.

Defendant points to the deposition of only one Plaintiff who testified that he spent more than fifty percent of his time on exempt work. (Huff Dep. at 149–55, 223–25.) In the Court's judgement, this single discrepancy carries no weight.

Defendant also argues that sixty-five of the California opt-in Plaintiffs have previously signed sworn declarations admitting that a majority of their time was spent performing managerial tasks. (Decs. of Cali. Opt-in Plaintiffs, Def. Exs. 39–103.) Defendant asserts these declarations alone establish the class is not similarly situated.

Plaintiffs respond that these sworn declarations were signed in 2001 prior to the time period at issue in this case. Plaintiffs argue that the role of the store manager in California has evolved since 2001, demonstrated by Defendant reclassifying all of its California store managers as non-exempt in 2003. (See A.87 Angell Dep.; A.88 Kamiya Dep.) Plaintiffs further argue that this Court's determination should not be based on a snapshot of what certain opt-in Plaintiffs were doing during a time period not relevant to the present litigation.[12]

With only one opt-in Plaintiff identified by Defendant as having spent more than fifty percent of his time on non-exempt duties, the Court finds the Plaintiffs are similarly situated with respect to this factor.

### ii. The relative importance of non-managerial duties as compared to other duties.

Defendant asserts that the bright line standard for determining the "relative importance of managerial duties" turns on

what they suggest was an improper strategy to present a limited and selective picture of the relevant facts. Plaintiffs were not prejudiced in any way by the manner in which Defendant conducted discovery.

12. Plaintiffs have also submitted declarations from 55 opt-in plaintiffs from California alleging that they spent the majority of their time on non-exempt work. (P1. Ex. A.2–A.56.) Defendant takes issue with these declarations. Defendant argues the declarations should not be considered as evidence in this decertification stage because Plaintiffs submitted them *after* Defendant filed its motion. Therefore,

the declarants have not been subject to cross examination. Defendant asserts these declarations should be given little, if any, weight.

The Court agrees with Defendant that the affidavits merit little weight. The Court has not relied on these declarations unless specifically stated otherwise. However, reliance on the declarations would not be improper. The Eleventh Circuit stated in *Anderson* that the Court may rely on affidavits and allegations as evidence of class similarity "depending upon the evidence presented by the party seeking decertification." *Anderson*, 488 F.3d at 953.

the significance of the managerial tasks performed by the employee to the success of the facility or business operation. For support, Defendant relies on *Moore v. Tractor Supply Co.*, 352 F.Supp.2d 1268, 1275 (S.D.Fla.2004), *aff'd* 140 Fed.Appx. 168 (11th Cir.2005). Far from a brightline standard, this test is only implicitly suggested in *Moore.* *Id.* Defendant has not cited any case law suggesting this test is controlling for "the relative importance of managerial duties." The more appropriate standard for this factor can be found in the full text of the corresponding regulation: "the relative importance of the exempt duties **as compared with other types of duties.**" 29 C.F.R. § 541.700 (2005) (emphasis added.)

Instead, relying on *Moore*, Defendant points to the store managers' different perceptions on how much they contributed to the success of the store. Four testified that they perceived business at their respective stores grew because of their management style (Overton Dep. at 202–03; Jacobson Dep. at 71–73; Stevens Dep. at 235–36; Weingber Dep. at 32), while four others testified they had little to do with any improvement in the stores performance. (Pickering Dep. at 204; Keeton Dep. at 39–40; 113–13, 146; Schlenker Dep. at 40–41; Moyers Dep. at 83–84.) Others believed their own management style had varying impact on the store's success.

Defendant consistently focuses on the different *management styles* of the individual opt-in Plaintiffs, rather than on the similarity of the tasks the managers are required to perform and the impact the performance of the various tasks have on the success of the stores. The fact that many managers will go about the performance of a particular task in different ways does not mean that they have different responsibilities. So long as the tasks are

similar, not identical, class treatment is appropriate. *Anderson*, 488 F.3d at 953.

By contrast, Plaintiffs point to the testimony of several store managers who consistently assert that taking care of the customer was probably the most important responsibility of the store manager. (A.74 Platt Dep. at 35–36 [customer service was number one; biggest requirement of all was to take care of the customer]; A.75 Schlenker Dep. at pp. 98, 154 [primary function was to be up front serving coffee, selling pastries, and making sure the retail wall was clean; that was the primary responsibility]; A.76 Moyers Dep. at p. 130[customer service was number one priority]; A.77 Weinberg Dep. at pp. 33, 289–90 [what is important to driving the business is waiting on customers; number one duty was preparing coffee for customers.]; A.67 Hons Dep. at 76 [the manager's role as a barista is as important to anything else the store manager does as it applied to the Starbucks Experience]; A.60 Sandberg Dep. at 105–06 [building the relationship with the customer is certainly as important as any other aspect of the store manager position.] )

Absent any record evidence that the exempt duties performed by the managers as compared to the non-exempt duties differ in relative importance, and recognizing that differing management styles does not translate into having different responsibilities, the Court fails to see how the managers' differing *perceptions* on how they contribute to a store's success renders the class dissimilar.

### iii.   The employee's relative freedom from direct supervision.

The third factor to be considered under the primary duty test is the amount of relative freedom the employee has from direct supervision. All store managers were supervised to some extent by a district manager. Defendant asserts that the

degree to which managers were supervised varies substantially both in the character of oversight and the frequency of contact between managers and their district managers.

For support, Defendant identifies two opt-in Plaintiffs who testified that they were free from supervision—one manager's judgment was trusted and the other manager was given "greater 'latitude' than other store managers because of his experience." (Platt Dep. at 194–94; Huff Dep. at 73–73.) Additionally, two other opt-in Plaintiffs testified their freedom of supervision changed depending on their district manager. Carrie Berger testified one district manager rarely visited her store and trusted her discretion, while the other district manager came by the store daily (Berger Dep. at 180, 218); Wendi Stevens testified one district manager would visit her store once a week and leave her 100% accountable, while the other district manager was a constant presence in her store who micro-managed its operation (Stevens Dep. at 70–71). Finally, Defendant cites to three store managers whose district managers essentially micromanaged their store. (Kennick Dep. at 94; Marten Dep. at 137–38; Thorn Dep. at 33.)

Additionally, Defendant emphasizes that some district managers would visit their store managers frequently (two to five times a week) while others would visit less frequently (every couple of weeks to every few months). Defendant also asserts that district managers communicate with store managers via e-mail and telephone to varying degrees—some calling often, others calling less often.

While Defendant successfully highlights differences among some members of the purported class relative to the *degree* to which they may be free from direct supervision, the critical fact remains that all store managers are subject to some form of direct supervision. Surely, just as store managers have different management styles, so too do district managers. Whether a district manager chooses to check in weekly or monthly, by telephone or e-mail, once a week or once a month, is primarily indicative of a district manager's style of management. The amount of oversight is also a function of the capabilities and experience of the store manager.

These individualized differences are not sufficient to outweigh the overriding similarity that store managers share. All store managers are required to stay in contact with their district manager via phone or e-mail—Defendant's corporate policy requires store managers to check voicemail and e-mail a minimum of three times a day. (A.83) Further, all district managers visit their store managers at least once a month, if not more often. The overall similarities relative to direct supervision outweigh the individual differences that may exist

iv. **The relationship between the employee's salary and the wages paid to other employees performing nonexempt work.**

Plaintiffs assert that after accounting for the extra hours store managers work and the fact that non-exempt employees earn overtime compensation, store managers earn little more than non-exempt assistant store managers, shift supervisors, and baristas. If baristas and shift supervisors worked the number of hours store managers do, the baristas and shift supervisors would make as much, if not more, than store managers.

For support, Plaintiffs cite to the declarations of 55 opt-ins from California, which the Court has previously indicated it will give no weight. (A.2–A.56.) The only other evidence relied upon by either party is Defendant's citation to named Plaintiff Laurel Overton's deposition. (Def. Reply Brief, Ex. 2 Overton Dep. at 133–36, 138–

39, 220–21.) Ms. Overton testified that she earned more than her highest paid subordinate would have earned working the same hours. (*Id.*) When determining whether the class is similarly situated, the Court concludes that demonstrating that a single Plaintiff typically earns more than her subordinates is insufficient to show dissimilarity across the entire class.

### v. The frequency with which the employee exercises discretionary powers.

Defendant has devoted considerable effort attempting to demonstrate that the store managers exercise their discretionary powers to varying degrees. Defendant has identified the following tasks which it believes are performed with sufficient variance to warrant decertification: scheduling, direction of employees, store inventory, reports, safety and security, and training and coaching.

*Scheduling*

Every Starbucks store follows the Automated Labor Scheduling ("ALS") system. ALS forecasts anticipated employee needs and then creates a schedule setting forth the number of employees required to work designated shifts. (A.57 Retail Management Training Docs--What is Automated Labor Scheduling.) Starbucks corporate documents describe how ALS creates the "best possible schedule" and cautions store managers not to edit the schedule it produces. (*Id.*) Ideally, there should be a "zero" variance between the forecasted schedule and the actual schedule implemented by the store manager. (*Id.*) It is undisputed that all store managers were required to use the ALS system.

Defendant argues that store managers exercised their scheduling powers differently: (a) some (four) [13] were able to alter the number of individuals assigned to a particular shift, and (b) some (seven) [14] were able to schedule more hours than the system allowed. Despite these differences, all store managers had to follow the ALS system and attempt to achieve a zero variance. (A.57 Retail Management Training Docs—What is Automated Labor Scheduling.) The fact that some managers were able to alter the ALS-generated schedules weighs slightly in Defendant's favor, but does not overcome the overriding similarity relative to the required use of the ALS system and the expected adherence to the schedules produced by it.

*Direction of Employees*

The store manager job description states that store managers are expected to direct their employees' work, including the manner in which partners are deployed. (Job Description.) The record evidence establishes that all store managers carried out this responsibility. In order to support its claim of dissimilarity, Defendant highlights the different management styles certain opt-in Plaintiffs employed. For example, one store manager deployed the partners in the coffee shop based on his assessment of the partners' skills (Thorn Dep. at 171), while another store manager said deployment was not based on anything in particular (Griffith Dep. at 207–07). Some store managers testified that they could observe partners during work (Seepes Dep. at 298–99), while others were too preoccupied with their own work to notice how the baristas were performing (Houston Dep. at 75–76). One store manager would make "suggestions" to partners on how to work more efficiently (Seepes Dep. at 298–99), while another

---

13. Keeton Dep. at 209–10; Lenox–Sharifi Dep. at 259–60; Stevens Dep. at 123–26; Huff Dep. at 134–35, 147, 48.

14. Kooda–Bolin Dep. at 281–82; Moscon Dep. at 231–32; Bannon Dep. at 229–31; Griffith Dep. at 158–61; Oliva Dep. at 158–59; Ficklen Dep. at 143.

"corrected partners" and motivated his staff (Ritter Dep. at 217–21, 233). One store manager even told the employees "what needed to be done." (Overton Dep. at 207–08.) These anecdotes simply establish that each store manager has a different leadership and management style; all possessed the power to direct their employees work and did so.

*Store Appearance and Set-up*

Defendant asserts that two opt-in Plaintiffs had responsibility for the appearance of the store (Overton Dep. at 30; Weinburg Dep. at 145–46), while one (Pickering Dep. at 149–50) [15] said her district manager was responsible for its appearance. A fourth store manager (Seepes Dep. at 84) shared responsibility with the rest of the employees for the store's appearance. Regardless, all four store managers possessed some responsibility for set-up of their stores. Additionally, all store managers were required to follow the "Siren's Eye"—a corporate document which details exactly how stores should be set-up for an upcoming promotion or sale by detailing where products should be placed in the store. (A.60 Sandberg Dep. at 219–221.) If a product is delivered that does not fit into the "Siren's Eye" schematic, the store manager must notify the district manager. (*Id.*) The Court concludes there are no *material* differences evident among the opt-in Plaintiffs with respect to store appearance and set-up.

*Store inventory*

Starbucks store managers are in charge of ordering products for their stores, though they may choose to delegate this duty to their shift supervisors or to an assistant manager. (Job Description.) The starting point for ordering is the "par" level established by the company's standards, which set expected levels of ordering for each store based on the volume of business, the season, and other relevant factors.

Defendant identifies four opt-in Plaintiffs who were able to adjust the par levels on their own without district manager approval (Bannon Dep. at 51–52; Huff Dep. at 166–67; Ficklen Dep. at 244–45; Thorn Dep. at 152–53). Two store managers could deviate from par levels only with district manager approval (Platt Dep. at 71–72; Moyers Dep. at 202). Plaintiffs respond that six store managers represents too small a percentage of the class to be significant in the decertification analysis, when the evidence indicates that all of the other opt-in Plaintiffs have district managers who were heavily involved in the process. Plaintiffs do not cite to any record evidence to support this general claim. Accordingly, some weight is afforded to Defendant on this factor.

*Reports*

Store managers all have access to various company reports, including profit and loss statements, and they are expected to use them to improve their store's performance. (Job Description.) Defendant argues that the store managers utilized the reports differently, some relying on the reports while others did not. This is clearly a question of management style and not a question of job responsibility. Accordingly, the Court gives no weight to Defendant on this factor.

---

15. Defendant relies heavily on Erin Pickering's and Jacques Jacobson's testimony throughout the motion, consistently using them as examples of store managers dissimilar to the rest of the class. The frequency with which Defendant relies on Erin Pickering's and Jacques Jacobson's testimony diminishes rather than strengthens its argument. By having to rely on two store managers to support its contentions, Starbucks suggests there are few members of the purported class whose job responsibilities are dissimilar.

*Safety and Security*

Starbucks expects its store managers to take primary responsibility for the safety and security of their stores. (Job Description.) Defendant argues that three store managers testified their district managers handled safety in their stores (Marten Dep. at 193–94; Ritter Dep. at 328; Kim Dep. at 266). The three store managers' depositions, however, contradict this claim. One store manager (Kim) made subsequent contradictory statements, first agreeing that store managers were responsible for the administration of the safety program and then altering his position. (Kim Dep. at 266.) Another store manager (Marten) testified that his district manager would review a safety and security audit once a month, but that he was responsible for the standard being met the rest of the month. The final store manager (Ritter) testified that "in safety and security, within the four walls, most of the time it would be the store manager." (Ritter Dep. at 328.)

Defendant also directs the Court to the testimony of opt-in Plaintiff Abigail who asserted that she was proactive when it came to store cleanliness. (Seepes Dep. at 262–63.) Another store manager (Berger Dep. at 256) shared safety responsibilities with her employees. Store manager Thorn (Thorn Dep. at 99–100) testified he was responsible to ensure employees acknowledged reading safety packets sent from corporate headquarters on topics such as slip and falls. The Court concludes that Defendant has failed to demonstrate any material differences among the purported class with respect to safety and security.

*Training and Coaching*

Store managers are expected to oversee the formal training of new retail partners. (Job Description.) The record evidence indicates that most of the store managers oversaw the training process and decided whether the new partners were to be fully certified and ready to begin work as baristas. Defendant identifies two store managers who were dissimilar-one store manager's district manager was responsible for ensuring proper training procedures were followed (Schlenker Dep. at 60), while another's district manager would re-certify that new partners had been properly trained (Kennick Dep. at 138–39). These two exceptions are insufficient for the Court to conclude that the class is dissimilar with respect to this factor. Defendant also asserts that some store managers trained employees differently through "newsletters" or by explaining the importance of "delivering 'legendary' service", evidencing dissimilarity among the purported class. The Court rejects this assertion. These differences merely reflect different leadership and management styles.

***vi. The authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, [or] promotion . . . are given particular weight***

With respect to the store managers' authority to hire, fire, promote, discipline, and evaluate employees, the evidence demonstrated that district managers were involved to some extent in the decision making process. Defendant pinpoints differences regarding how much latitude store managers possessed in making these decisions. However, the reasons for these differences are unclear.

As previously noted, just as store managers' management styles differ, so too will the styles of district managers. The Court concludes that it is unreasonable to expect all district managers to act, think and manage in the same way.

Defendant fails to illustrate any material differences among store managers relative to their hiring recommendations. Defendant points to only one opt-in Plaintiff,

Erin Pickering, who unequivocally testified that her district manager "called the shots." Effectively, the remaining opt-in Plaintiffs relied upon by Defendant had complete authority in hiring decisions, either by delegation from the district manager or as a result of routine approval by the district manager. Defendant also outlines the different criteria opt-in Plaintiffs employed in making their hiring decision (corporate guidelines, subjective assessments, energy levels). If these types of individualized personal preferences were sufficient to support decertification, no purported class of managers could meet the requirements of the statute.

Defendant claims additional support for decertification in the disparity of the weight given to recommendations for promotions made by store managers. Two store managers' recommendations regarding promotions were always approved (Jacobson Dep. at 60–61; Keeton Dep. at 87), two other store managers apparently did not make recommendations for promotions (Marten Dep. at 133; Schlenker Dep. at 80–81), and yet other store managers had some of their recommendations for promotions accepted and others had them rejected. It is apparent that district managers had differing views on store managers' ability to promote. This lack of similarity with respect to promoting employees provides some weight to Defendant in the decertification analysis.

Defendant also relies upon differences in the preparation and use of performance evaluations. Store managers are expected to prepare performance evaluations for the partners in their stores. These evaluations produce a rating which is used to determine what *pay increases* employees will receive. Defendant notes there are differences with respect to the amount of involvement district managers have in the store managers' preparation of the performance evaluations and differences in

the way district managers approve or reject the performance evaluations. For example, some district managers participated more in the formulation of the evaluation than others—Monica Kennick's district manager told Ms. Kennick how her employees were performing and provided comments on the review forms (Kennick Dep. at 95, 98, 285–86, 108–11). Karen Bannon issued performance reviews without any input from her district manager (Bannon Dep. at 131, 139). Some district managers would automatically approve evaluations as long as the evaluation did not fall into a "needs improvement" or "exceeds requirement" category. (Berger Dep. at 247–48). Other district managers would look at the evaluation before it was distributed to the partners (Pickering Dep. at 84–85; Stevens Dep. at 75–76). Yet another district manager would only review the evaluation after it had been issued (Griffith Dep. at 79).

Defendant fails, however, to demonstrate how much weight these "evaluations" are given in pay increase or promotion decisions. Defendant fails to provide evidence of what occurs after an evaluation is approved or issued. The testimony is consistent, however, that all opt-in Plaintiffs prepare evaluations and all are reviewed by the district manager at some point. Without evidence of how the performance evaluations prepared by the store managers are actually used in pay increase or promotion decisions, Defendant has failed to demonstrate any material differences among the opt-in Plaintiffs relative to this criterion.

With respect to employee discipline, Defendant successfully demonstrates, and Plaintiffs leave un-rebutted, numerous differences among the opt-in Plaintiffs. Some opt-in Plaintiffs had no discretion in determining whether to discipline employees who violated company rules and had to

consult the district manager prior to disciplining the employee (Banon Dep. at 237; Kennick Dep. at 94, 121, 189). Other store managers did have discretion and chose not to discipline employees for minor rule violations (Berger Dep. at 136; Stevens Dep. at 165; Seepes Dep. at 225–26). In cases where corrective discipline was necessary, the testimony of store managers diverged on whether they could administer discipline without their district managers' approval-some always consulted their district manager before administering discipline (Marten Dep. at 162; Cohen Dep. at 112; Stevens Dep. at 83–87), while others would administer discipline without consulting the district manager (Ritter Dep. at 120–21; Griffith Dep. at 151–52; Huff Dep. at 116; Keeton Dep. at 53, 60; Jacobson Dep. at 148–51). While those that had to consult the district manager are clearly in the minority, there are legitimate differences among the purported class members in this regard which weigh in Defendant's favor.

With respect to termination of employees, all but one of the Plaintiffs either did not have the authority to terminate or had to first seek district manager approval to terminate an employee. (Schlenker Dep. at 144; Oliva Dep. at 192; Pickering Dep. at 192.) Only one opt-in Plaintiff, to whom Defendant repeatedly cites to point out discrepancies, testified that she could terminate employees without approval for

"certain types of offenses."[16] (Jacobson Dep. at 218–210.) One aberration in this regard does not create a dissimilarity among the class.

*Conclusion*

In conclusion, the Court must weigh all of the record evidence, including the corporate admissions of Defendant, to determine whether the class is similarly situated. While noting there are some differences throughout the class, it is not possible, nor would it be consistent with the intent of § 216(b), to require that the class be identical. *Anderson,* 488 F.3d at 953. In almost all of the major criteria relevant for the exemption analysis, Plaintiffs have demonstrated—and Defendant has failed to sufficiently refute—that the class is similarly situated. Of the six criteria set forth by the regulations deemed pertinent in determining whether an employee is exempt, the first four almost all weigh in Plaintiff's favor—(i) the amount of time spent performing managerial tasks, (ii) the relative importance of non-managerial duties compared to other duties, (iii) the employee's relative freedom from direct supervision,[17] and (iv) the relationship between the employee's salary and the wages paid to other employees performing nonexempt work. It is only when the fifth criterion is evaluated—the frequency with which the employee exercises discretion-

---

**16.** Defendant argues that two Plaintiffs, David Ritter and Sean Pendlebury, also terminated employees without first seeking district manager approval. However, the record evidence supplied by Defendant does not support its assertion. Defendant only supplied the Court with a portion of the various deposition transcripts. Based upon what was presented to the Court, it appears from David Ritter's testimony that when he carried out a termination decision, he would sometimes tell the employee of the decision without the district manager sitting in the room. (Ritter Dep. at 297.) Nothing in the portion of Mr. Ritter's tran-

script provided to the Court indicates he had the authority to make the termination decision without his district manager's approval. Defendant also relies on Plaintiff Pendlebury's testimony, but has failed to provide the Court with a copy of Pendlebury's transcript.

**17.** Here Defendant was able to identify two opt-in Plaintiffs who are dissimilar to the class because they enjoy near complete freedom from supervision. Defendant also identified two potential class members who temporarily enjoyed similar freedom. These differences are afforded some weight.

ary powers—do differences emerge. The differences that do emerge in scheduling, store inventory and, ostensibly, safety and security, are too insignificant to warrant more than a modicum of weight. *Anderson,* 488 F.3d at 953 ("the more material the distinctions revealed by the evidence, the more likely the district court is to decertify the collective action.") Defendant derives the greatest amount of support in the final category—authority in personnel decisions. It is here Defendant demonstrates legitimate differences among the store managers in terms of promotion decisions and employee discipline, albeit with respect to only three or four opt-in Plaintiffs.

However, when these differences are weighed against all of the evidence demonstrating the class is similarly situated, the scales are clearly tipped in Plaintiffs' favor. Many of the differences Defendant identifies are partially attributable to different management styles, either by the store manager or the district manager. In sum, every class under § 216(b) will have differences; however, class members need only be similar, not identical. If Defendant's contentions that the class must be similar in almost all respects was to prevail, the intent behind class certification under § 206(b) would be frustrated and the statute's class provisions would be effectively emasculated.[18]

## B. Individualized Defenses

■ Defendant asserts there are individualized defenses unique to individual opt-in Plaintiffs that render class treatment inappropriate. First, Defendant argues that numerous opt-in Plaintiffs have prepared resumes that directly contradict the allegations in the complaint. For example, one opt-in Plaintiff's resume stated she was responsible for hiring, but when asked in deposition whether she was in fact responsible for hiring, she replied "no." (Stevens Dep. at 227–233.) Another's resume stated he managed costs and inventory for his store, then later testified he only communicated with his district manager about these matters "in a relatively insignificant way." (Thorn Dep. at 39–40.) A third Plaintiff's resume states she was responsible for ordering, merchandising and managing every aspect of retail environment, but she testified this meant she was constantly there as a barista. (Brooks–Delgado Dep. at 58.)

These contradictions are matters of credibility for the factfinder, not individualized *defenses.* As the Sixth Circuit has explained in *Schaefer v. Indiana Michigan Power Co.,* cited to by Defendant for support, resume contradictions in an FLSA exemption case "merely raise credibility questions for the factfinder ... we have recognized that 'resumes are typically designed to enhance the employee's duties and responsibilities in order to obtain a job.'" 358 F.3d 394, 401 (6th Cir.2004)(citing *Ale v. Tennessee Valley Authority,* 269 F.3d 680, 689 n. 2 (6th Cir.2001)).

Defendant's second alleged individualized defense also involves a credibility is-

---

**18.** Defendant also directs the court to *Mims v. Starbucks Corp.,* 2007 WL 10369 (S.D.Tex. 2007), where two Starbucks managers filed FLSA exemption claims nearly identical to the claims in the instant case. The court granted summary judgment in favor of Defendant, holding that the plaintiffs were properly classified as exempt. Defendant argues that *Mims* requires one of two findings in the present case: either all store managers are properly classified as exempt or not all members are similarly situated. (Defendant Mot. At 30.) Defendant's arguments are rejected. The court in *Mims* issued a ruling on the merits; the court did not conduct a decertification analysis for the *two* plaintiffs. Accordingly, *Mims* is inapposite to the decertification issue presently before this court and any argument based on *Mims'* analysis on the merits is premature.

sue. Defendant directs the Court to two opt-in Plaintiffs (Jacobson and Platt) whose testimony in a previous case contradicts their deposition testimony in the instant case. Defendant identifies four contradictory statements, two from each opt-in Plaintiff. These four statements present issues of credibility and do not weigh heavily in favor of decertifying the class.

Defendant's third and final alleged individualized defense involves the sixty-five opt-in Plaintiffs from California that had previously signed sworn declarations in 2001 which contradict allegations in the complaint. The opt-ins stated in their previous declarations that they spent the majority of their time performing managerial tasks in contradiction to the allegation in the complaint that store managers spend less than 10% of their work time on managerial tasks. As previously discussed, Plaintiffs represent to the Court that this lawsuit only concerns the Starbucks managers *after* 2001. Plaintiffs also argue that the role of a Starbucks store manager has evolved since 2001, whereby store managers spend a majority of their time performing nonmanagerial tasks. All of the record evidence, save for the testimony of one-opt in Plaintiff and these previous declarations, indicate that Plaintiffs spend the majority of time performing non-managerial tasks. If Defendant wants to dispute this claim at trial, the previous declarations will be available as impeachment of any opt-in Plaintiff who signed a 2001 declaration.

**C. Fairness and Procedural Considerations**

■ Defendant re-asserts its arguments that issues central to the outcome of the case cannot be resolved through common evidence and require "painstaking factual analysis" of the circumstances by the factfinder for every class member. The Court rejects this contention. Defendant will have a full and fair opportunity at trial to attempt to defeat all of the claims asserted by the class.

Defendant next asserts that a class action is not necessary to secure the rights of the opt-in class; decertifying the class will only dismiss their claims without prejudice and allow them to re-file their individual suits with the benefit of two plus years of discovery. Defendant also suggests that if the class of nearly 900 Plaintiffs is decertified, few would re-file their claims. Defendant's arguments are unavailing.

Several federal courts have observed that the FLSA is designed to be a remedial statute, and it "should be given a broad reading, in favor of coverage." *See e.g. Kelley v. Alamo,* 964 F.2d 747, 749–50 (8th Cir.1992); *Fegley v. Higgins,* 19 F.3d 1126, 1132 (6th Cir.1994). Collective actions under § 216(b) are designed to help lower the costs to plaintiffs through the pooling of resources and to benefit the judicial system by efficient resolution in one proceeding of common issues of law and fact. *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The Court must balance these benefits with any potential detriment to the defendant and the potential for judicial inefficiency as a result of collective treatment. *Id.*

Here, Plaintiffs have met their burden and demonstrated they are similarly situated in order to benefit from the advantages of a collective action under § 216(b). If decertification were granted, the federal court system potentially would have hundreds of individual lawsuits all dealing with the same issue. Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases. Defendant has also failed to present any argument of merit which convinces the Court it will not able to manage the trial in

1364

"a manner that will not prejudice any party or be particularly burdensome to a jury," *Reyes v. Texas Ezpawn, L.P.,* CivA No. V–03–128, 2007 WL 101808 at 6 (S.D.Tex. Jan 8, 2007)(citing *Thiessen,* 267 F.3d at 1105).

In light of the record evidence establishing the class is similarly situated, there are no fairness or procedural considerations raised by Defendant that disturb the Court's conclusion; the case will proceed collectively.

## IV. Conclusion

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for De-certification **(DE 291)** is **DENIED;** Plaintiffs will proceed as a class.

**DONE AND ORDERED** in chambers in West Palm Beach, Palm Beach County, Florida, this 20th day of September, 2007.